UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.

DARELL REED,

        Defendant.
_____/

Case No. 17-20837
Hon. Mark A. Goldsmith

**OPINION & ORDER**
**(1) DENYING AS MOOT DEFENDANT'S FIRST MOTION TO SUPPRESS (Dkt. 126)**
**AND (2) DENYING DEFENDANT'S SECOND MOTION TO SUPPRESS (Dkt. 159)**

Defendant Darrell Reed, proceeding pro se, moves to suppress "all evidence" from a traffic stop and search of a car that Reed was driving in November 2017 and a search of Reed subsequent to his arrest, as well as all evidence discovered as a result of these searches (Dkt. 159).[1] The Government opposes this motion, arguing that law enforcement officials had at least reasonable suspicion to conduct the traffic stop, the officials had probable cause to search the car and arrest Reed, and the officials lawfully searched Reed incident to the arrest (Dkt. 162). The Court held an evidentiary hearing on May 6 and June 1, 2021. For the following reasons, the Court denies Reed's motion.

**I. BACKGROUND**

The following facts are derived from the unrebutted testimony of several witnesses who testified at the evidentiary hearing: United States Postal Service (USPS) Agent Matt Grams, USPS

---

[1] Previously, when Reed was represented by counsel, he filed a nearly identical motion to suppress (Dkt. 126). That motion is denied as moot.

Agent Bryan Sartori, USPS Agent Todd Ziobro, USPS Agent Michael Lynch, Drug Enforcement Administration (DEA) Officer Michael Lencioni, and Roseville Police Officer Brian Dobrzycki.

On September 22, 2017, USPS agents interdicted a parcel shipped from California to an address in Detroit, Michigan. 5/6/21 Hr'g Transcript at 7–8 (Dkt. 173). After conducting an inspection of that parcel, which included a positive K-9 alert, the agents obtained a search warrant for the parcel. Id. at 8. Inside the parcel, agents found three plastic bags containing crystal methamphetamine "ice." Id.

On September 26, 2017, agents interdicted a second parcel that had been shipped from California to an address in Flint, Michigan. Id. at 8. Agents flagged the second parcel because an IP address that had queried the tracking number for the first parcel also queried the tracking number for the second parcel. Id. at 8–10. Agents noticed numerous similarities between the two parcels, including similar handwriting on both parcels. Id. at 10. An investigation of the second parcel, which again included a positive K-9 alert, allowed agents to obtain a search warrant for it. Id. at 8. Inside the second parcel, agents found crystal methamphetamine ice. Id.

On November 24, 2017, agents interdicted a third USPS parcel shipped from California to a Stanley Street address in Jackson, Michigan. Id. at 11, 27–28. An investigation of that parcel, which included a positive K-9 alert on the parcel, allowed agents to obtain a search warrant for it. Id. at 28. Inside the third parcel, agents found crystal methamphetamine ice. Id. The agents later checked the USPS mail system and learned that the same IP address that had queried the first and second parcels also queried the third parcel. Id. at 11.

As agents investigated the parcels and addresses, they began placing "mail watch" alerts on certain addresses in the USPS database so that they would be alerted when parcels were shipped to those addresses. Id. at 12. One of these addresses was 29942 Utica Road in Roseville, Michigan. Id. On November 29, 2017, USPS agents interdicted a USPS parcel shipped from

2

California to "Michael Shumate" at the Roseville address. Id. at 21. An investigation of that parcel, which included a positive K-9 alert, allowed agents to obtain a search warrant for it. Id. at 15. Inside the fourth parcel, agents found crystal methamphetamine ice. Id. at 14.

On November 30, 2017, DEA, USPS, and Roseville law enforcement agents conducted a controlled delivery at the Roseville address. Id. at 15–16, 32–33. During this process, the agents were stationed at different locations near the Roseville address and each played a different role. Id. at 37–38. They communicated all of their observations with each other via radio. Id. at 38.

To conduct the controlled delivery, the agents removed the crystal methamphetamine from the parcel and inserted items of comparable weight, including a monitoring device. Id. at 16–17, 34. The monitoring device permitted Ziobro—who was parked on the street next to the Roseville address with the device—to monitor the parcel's movement and monitor if the parcel was opened. Id. at 34–35. This is because the device emits different tones based on motion of the package and has a light sensor that would be triggered when the box was opened. Id.

Lynch conducted the controlled delivery around 12:45 p.m. Id. at 19, 33. When he knocked on the door of the Roseville address, the door was opened by a black female, who was later determined to be Shaquana Shumate. Id. at 20–21.[2] Lynch asked her if Michael Shumate lived there, and she said yes. Id. at 21. She took the parcel from Lynch and closed the door. Id. As Lynch was conducting the controlled delivery, the monitoring device indicated that the parcel was moving. Id. at 38.

Although the agents had obtained an anticipatory search warrant for the Roseville address, they chose to refrain from executing it immediately after the controlled delivery. Id. at 40. Instead, they waited to see if someone would come to open the parcel or retrieve it. Id.

---

[2] Because Shaquana and Michael share the same last name, the Court refers to each by first name to avoid confusion.

Lencioni was stationed in a parking lot across from the Roseville address. Approximately 45 minutes after Lynch completed the controlled delivery, Lencioni saw Shaquana leave the Roseville address with a backpack. Id. at 58. She got into a car and drove away. Id. However, the monitoring device did not indicate to Ziobro that the parcel was moving during this time. Id. at 40–41. Dobrzycki began to follow Shaquana in his car, and as he approached Shaquana's vehicle, he noticed a crack in her windshield. 6/1/21 Hr'g Transcript at 15 (Dkt. 174). Dobrzycki conducted a traffic stop on Shaquana's vehicle. Id. During the stop he saw a small cooler bag in the back seat; however, he did not see the parcel. Id. at 16. Shaquana told him that the bag had her lunch in it. Id. Ziobro drove by the traffic stop as it was happening; the monitoring device did not pick up any signals from the transmitter near Shaquana's car. 5/6/21 Hr'g Transcript at 42. After Shaquana was released from the stop, Dobrzycki and Ziobro then returned to their respective stations near the Roseville address.

Around 3:00 p.m., Lencioni saw a white Nissan Rogue SUV arrive in the parking lot in front of the Roseville address and park in the same spot where Shaquana's car had been parked. Id. at 59. He observed several black men get out of the SUV and enter the Roseville address. Id. at 60–61. The men were inside the apartment for approximately two minutes. Id. at 61. Three men then exited the Roseville address and got back into the SUV. Id. Lencioni saw that the man entering the front passenger seat—later identified as Reed—was carrying a box that appeared to be the controlled delivery parcel. Id. The SUV then began to leave the parking lot. Id. at 61–62. Ziobro observed that the monitoring device indicated that the parcel was moving during this time. Id. at 44.

Dobrzycki was parked nearby and was informed via radio of Lencioni's observations. 6/1/21 Hr'g Transcript at 17–18. The SUV exited the parking lot and began traveling at a high rate of speed on Common Road. Id. Minutes after the men had left the house, Dobrzycki caught

4

up with the SUV and activated his vehicle's emergency lights to effectuate a traffic stop on the SUV. Id. at 19. After he turned his lights on, he saw a black item being thrown out the front passenger window of the SUV. Id. at 20. The SUV continued a short distance and then stopped. Id.

During the traffic stop, Dobrzycki ordered the driver (Reed) from the vehicle. Id. The agents arrested all three men and searched the SUV. Dobrzycki conducted a pat down of Reed and discovered a large wad of cash in Reed's front pants pocket. Id. at 21. The agents searched for the black item that had been thrown from the vehicle and located a black digital scale. Id. at 22. According to Grams's sworn affidavit, the agents searched the SUV and found the parcel, a firearm, and a vacuum sealer and bags, items commonly used in drug trafficking. Grams Aff. at ¶ 6 (Dkt. 1).

## II. ANALYSIS

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend. IV. In general, "the Fourth Amendment requires police officers to obtain a warrant prior to conducting a search." United States v. Smith, 510 F.3d 641, 647 (6th Cir. 2007). However, there are certain exceptions to this rule. As relevant here, an officer may perform a traffic stop if he possesses either probable cause of a civil infraction or reasonable suspicion of criminal activity. United States v. Lyons, 687 F.3d 754, 763 (6th Cir. 2012). Further, if officers have probable cause to believe that a vehicle contains evidence of criminal activity, the officers may search any area of the vehicle in which the evidence might be found. Arizona v. Gant, 556 U.S. 332, 347 (2009). Finally, if officers have probable cause to arrest an individual, they may search that individual incident to the arrest. United States v. Smith, 549 F.3d 355, 359 (6th Cir. 2008). Under the exclusionary rule, courts may suppress evidence "obtained as a direct result of an illegal search or

seizure" as well as evidence that is the "fruit of the poisonous tree." Utah v. Strieff, 136 S. Ct. 2056, 2061 (2016).

Reed seeks to suppress "all evidence" from the traffic stop, search of the SUV, and search of his person subsequent to his arrest, as well as all evidence later discovered as a result of these searches. Mot. at 1. Each argument is addressed and rejected in turn.

**A. The Traffic Stop**

Reed argues that Dobrzycki stopped the SUV that Reed was driving "without probable cause to believe that a traffic violation had occurred." Id. at 8. This is not the standard for assessing the constitutionality of a traffic stop. As stated above, an officer may perform a traffic stop if he possesses either probable cause of a civil infraction or reasonable suspicion of criminal activity. Lyons, 687 F.3d at 763. Reasonable suspicion requires more than a mere hunch; however, the standard is satisfied by a likelihood of criminal activity less than probable cause and falls considerably short of the preponderance of the evidence standard. Dorsey v. Barber, 517 F.3d 389, 395 (6th Cir. 2008). If an officer possesses a particularized and objective basis for suspecting the particular person of criminal activity based on specific and articulable facts, he may conduct a stop. Id. Reasonable suspicion must be considered "under the totality of the circumstances, considering 'all of the information available to law enforcement officials at the time.'" Humphrey v. Mabry, 482 F.3d 840, 846 (6th Cir. 2007) (quoting Feathers v. Aey, 319 F.3d 843, 849 (6th Cir. 2003)). Officers are entitled "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." United States v. Arvizu, 534 U.S. 266, 273 (2002) (punctuation modified). "Pertinent circumstances include the officer's own direct observations, dispatch information, directions from other officers, and the nature of the area and time of day during which

6

the suspicious activity occurred." United States v. Campbell, 549 F.3d 364, 370–371 (6th Cir. 2008).

At the time of the traffic stop, the officers knew that (i) the Roseville address was the subject of a "mail watch" alert; (ii) a parcel containing crystal methamphetamine and addressed to Michael had been shipped to the Roseville address; (iii) Shaquana represented that Michael lived at the Roseville address and accepted the controlled delivery of the parcel; (iv) when Shaquana left the address, the monitoring device indicated that the parcel had not moved and Dobrzycki did not see the parcel in Shaquana's car; (v) three men arrived at the Roseville address in an SUV and entered the residence; (vi) when the men got back into the SUV to leave the residence, the driver carried a box into the SUV; (vii) as the men drove away, the monitoring device inside the parcel indicated that it was moving; (viii) when Dobrzycki attempted a traffic stop on the SUV, a black item was thrown out the front passenger window; and (ix) the SUV continued moving a short distance before stopping. All of this information was either relayed to or observed by Dobrzycki, who conducted the stop of the SUV. Based on these articulable facts, Dobrzycki had at least reasonable suspicion to believe that the occupants of the car were engaging in drug-related criminal activity.

Although Reed suggests that the monitoring device did not actually indicate that the parcel was moving when the parcel was carried to the SUV and the SUV drove away, he has produced no evidence to support this claim. Meanwhile, the Government elicited testimony from Ziobro showing that (i) the monitoring device emitted a certain tone to indicate movement and (ii) this tone was emitted when the parcel was moving. Further, even if the monitoring device did not indicate when the package was being carried away, Dobrzycki still had reasonable suspicion to believe that the men had retrieved the parcel from the Roseville apartment, based on the other information discussed above.

7

Reed also argues that Dobrzycki's reason for stopping Shaquana—her cracked windshield—was "fabricated" because it would have been "impossible" for Dobrzycki to see the crack from a distance. Mot. at 8–9. However, Reed cannot challenge the legality of the stop of Shaquana's vehicle. A defendant seeking to suppress evidence must demonstrate that he or she personally has a reasonable expectation of privacy in the place searched. Minnesota v. Carter, 525 U.S. 83, 88 (1998). In other words, Fourth Amendment rights are personal rights and may not be vicariously asserted. United States v. Noble, 762 F.3d 509, 526 (6th Cir. 2014). To have a reasonable expectation of privacy in a searched vehicle, the defendant must have been the owner, driver, or passenger of the vehicle. See United States v. Elmore, 304 F.3d 557, 558, 560–561 (6th Cir. 2002) (holding that a defendant cannot object to evidence obtained by police during the search of a car that the defendant did not own and in which he was neither the driver nor the passenger). Here, Reed he had no reasonable expectation of privacy in Shaquana's vehicle; there is no evidence that he owned that vehicle or was a driver or passenger of the vehicle at the time of the traffic stop.

In addition, Reed argues that the traffic stop of the SUV was a "fishing expedition" since the agents had a warrant to search the Roseville address but chose not to execute it. However, the mere fact that law enforcement officials have a warrant to search a residence does not mean that they are required to search the residence immediately. Nor does it somehow negate the lawfulness of an otherwise legal traffic stop.

Finally, Reed argues that law enforcement officials learned of his identity from an informant, Byron Wilson, before the November 30, 2017 stop, search, and arrest, and that "he was the intended target of the deliverance of 'sham' parcel on 11-30-2017." Mot. at 2. Reed has failed to put forward any evidence to support this claim. Meanwhile, the Government elicited testimony from Lynch, Ziobro, and Lencioni that they did not learn of any information from Wilson on or before November 30, 2017. 5/6/21 Hr'g Transcript at 22, 47, 64. Even assuming that Wilson

identified Reed prior to November 30, 2017, it is unclear how this information would help Reed. If anything, an informant's identification of Reed as someone involved in a drug trafficking operation prior to November 30, 2017 would arguably enhance the Government's position that the stop of the SUV was supported by reasonable suspicion. See, e.g., Bazzi v. City of Dearborn, 658 F.3d 598, 605 (6th Cir. 2011) (holding that an informant's tip, with minimal independent corroboration by the police, supports reasonable suspicion of illegal activity).

For these reasons, the stop of Reed's vehicle did not violate the Fourth Amendment.

### B. Search of the SUV

"If there is probable cause to believe a vehicle contains evidence of criminal activity," an officer may search "any area of the vehicle in which the evidence might be found." Gant, 556 U.S. at 347. "Probable cause" requires "only a probability" and is evaluated based on the totality of the circumstances. District of Columbia v. Wesby, 138 S. Ct. 577, 586 (2018). Therefore, while probable cause is a higher standard to satisfy than reasonable suspicion, it is still "not a high bar." Id. As discussed above, the totality of the information available to the agents proves that they possessed reasonable suspicion to believe that Reed and the other SUV passengers were engaged in illegal drug-related activity. The totality of this same information also proves that the agents had probable cause to believe that evidence of the drug-related activity—such as the parcel— would be found in the SUV. As a result, the agents' search of the SUV did not violate the Fourth Amendment.

### C. Arrest of Reed and Search of Reed Incident to His Arrest

"[S]earches of persons incident to a lawful arrest require no additional justification, beyond the establishment of probable cause for arrest." Smith, 549 F.3d at 360. "Police may arrest a person without a warrant," as happened in this case, "if they have probable cause at the time of the arrest to believe that the person has committed or is committing a crime." United States v. Caicedo,

9

85 F.3d 1184, 1192 (6th Cir. 1996). Given the agents' earlier observations—including their observation that Reed carried the parcel out of the Roseville address and into the SUV—combined with the fact that the parcel was found in the SUV once it was stopped, the agents clearly had probable cause to believe that Reed had committed or was in the act of committing a drug-related crime. Consequently, Dobrzycki's search of Reed incident to his arrest did not violate the Fourth Amendment.

### III. CONCLUSION

For the foregoing reasons, Reed's motion to suppress (Dkt. 159) is denied.

SO ORDERED.

Dated: July 27, 2021　　　　　　　　　　　　s/Mark A. Goldsmith
　　Detroit, Michigan　　　　　　　　　　　　MARK A. GOLDSMITH
　　　　　　　　　　　　　　　　　　　　　　United States District Judge

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 27, 2021.

　　　　　　　　　　　　　　　　　　　　　　s/Karri Sandusky
　　　　　　　　　　　　　　　　　　　　　　Case Manager