UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

United States of America,

        Plaintiff,                  Criminal No. 17-20837

v.                                Honorable Mark A. Goldsmith

D-1 Darell Davie Reed,

        Defendant.

_____/

# Government's Sentencing Memorandum for Darell Reed

## I.    Introduction

In 2017, Darell Reed and his brother acquired highly pure crystal methamphetamine, or "Ice," from California and distributed it in many states. Eventually, they were caught picking up a U.S. Postal Service parcel that contained more than two pounds of crystal meth. Based on a DEA/Postal Service investigation, Darell Reed was involved in a drug trafficking conspiracy from September to November 2017. Then, while on bond, he was arrested in a separate smash and grab case that is also pending before this Court (Case No. 19-20492).

In November 2021, Reed pled guilty to conspiracy to possess with intent to distribute controlled substances pursuant to a Rule 11 Plea Agreement. The parties agreed on some, but not all, applicable guidelines provisions and did not agree on a guideline range. They also agreed that a 120-month mandatory minimum applied and that the sentence may not exceed the bottom of the guideline range as determined by the Court. Based on the plea agreement, the PSR, and the fact that Reed has not

pled guilty in the smash and grab case, the government asks that the Court find that Reed's guideline range is 292-365 months based on a total offense level of 38 (38+2 (gun)-2 (acceptance of responsibility) and criminal history category III) and sentence him to **292 months in prison**, followed by a five-year term of supervised release.

## II.    Statement of Facts

### A. Origin of Investigation

From September 2017 through November 30, 2017, Darell Reed and Dray Reed worked together and with others to arrange for crystal methamphetamine to be shipped in parcels via U.S. Mail from California to Southeast Michigan. Once the methamphetamine arrived, they distributed it in Michigan and other states.

The Postal Service and DEA interdicted some of the parcels. One interdicted parcel, sent in late September 2017, was shipped to Darell and Dray Reed's mother's house on Pinehurst in Detroit, which was Dray Reed's address. The parcel was tracked online from the IP address at Darell Reed and Shaquana Shumate's home in Roseville. The parcel contained about <u>1.3 kilograms of 99% pure crystal meth</u>.

 

### B.  November 2017 Parcels

In late November of 2017, more parcels of methamphetamine were sent to Southeast Michigan, and three were interdicted by the Postal Service.

One of the late-November parcels was addressed to a house on Stanley Street in Jackson, Michigan. Again, the parcel was tracked online from the IP address at Darell Reed and Shaquana Shumate's home, and a subsequent search of Darell Reed's cell phone revealed that Darell Reed and Shaquana Shumate exchanged a text message with the parcel's tracking number. The parcel contained approximately 2.2 kilograms of 98% pure crystal meth.

 

A second late-November parcel was addressed to a residence on Utica Road in Roseville. Again, the parcel was tracked online from the IP address at Darell Reed and Shaquana Shumate's home. Law enforcement interdicted the Roseville parcel, found methamphetamine inside, and conducted a controlled delivery of the parcel. Shumate accepted delivery of it. Soon thereafter, Darell Reed, Dray Reed, and another individual arrived at the residence, and then left with the package.

 

As law enforcement attempted to conduct a traffic stop, Dray Reed threw a digital scale out of the front passenger window. After stopping the vehicle, law enforcement learned that Darell Reed was driving, Dray Reed was the front passenger, and there was a rear passenger. The parcel was on the front passenger floorboard by Dray Reed's feet.

Law enforcement found drug packaging materials in the back seat. Particularly relevant to a contested guideline provision, Darell Reed had a <u>Glock 27 pistol loaded with 19 live rounds</u> in the center console.

 

It turned out that the Utica Road address in Roseville was Darell Reed and Shaquana Shumate's residence, the location with the IP address that queried some of the parcels. The Roseville parcel contained more than <u>1.3 kilograms of 100% pure crystal meth</u>.

### C. Additional parcels linked to the Reeds

A search of Darell Reed's cell phone revealed that, in late November 2017, Darell and Dray exchanged text messages of four photographs of receipts for parcels mailed from the Los Angeles area to Michigan, and anticipated their delivery.



One was the Roseville parcel.



Two other receipts were for parcels destined for Redford and Clinton Township and were not interdicted.

 

The fourth receipt, which also contained a tracking number, was for a parcel destined for a residence on Lincoln Avenue in Flint. Law enforcement located this package and inside found more than 1.3 kilograms of 98% pure crystal meth.

  

It turns out another parcel that law enforcement interdicted in late September 2017 was also addressed to the same residence on Lincoln Avenue in Flint. That parcel was tracked online from the IP address at Darell Reed and Shaquana Shumate's home and contained more than 1.3 kilograms of 99% pure crystal meth.



Later investigation of Reed's financial records and airline travel revealed that in 2017 he sent more than $3,000 to people in Southern California via money transfer and that in late November 2017, right before the parcels arrived, Reed flew to Los Angeles on November 27, 2017, and back to Detroit on November 28, 2017.

Law enforcement's investigation revealed that the Reeds paid about $2,000 per pound of crystal meth in California and sold the drugs for about $10,000 per pound in the Midwest region.

Including all seized packages, the conspiracy involved more than 4,500 grams (4.5 kilograms) of crystal methamphetamine, or "Ice."

## D. Procedural History and Subsequent Arrest on More Federal Charges

After being arrested and charged in this case, Reed was released on bond. (ECF Nos. 22-23). While on bond, however, Reed became the leader of an extensive organization that committed smash and grab Hobbs Act robberies at jewelry stores in Indiana, Ohio, Illinois, Pennsylvania, South Carolina, Louisiana, and other states. In July 2019, Reed and nine other co-conspirators were charged in a criminal

complaint for their roles in certain robberies. (*United States v. Reed*, 19-20492, ECF No. 1, Complaint). The government filed a motion to revoke Reed's bond, which the Court granted. (ECF No. 85, Motion to Revoke Bond; ECF No. 88, Order Revoking Bond). Reed and the other individuals were later indicted. (*United States v. Reed*, 19-20492, ECF No. 27, Indictment; ECF No. 62, First Superseding Indictment; ECF No. 76, Second Superseding Indictment; ECF No. 251, Third Superseding Indictment). Reed's new case was assigned to this Court.

In 2020-21, Reed filed several motions to suppress evidence in this case. (ECF Nos. 126 & 159). Also in 2021, after having had several lawyers, Reed sought to represent himself, a request the Court granted, though it also appointed standby counsel. (ECF No. 147, Motion; ECF No. 152, Order; ECF No. 153, Order).

Covid-19 delayed the Court's consideration of the suppression motions, however, in 2021 the Court held a two-day evidentiary hearing and later denied Reed's motions. (ECF Nos. 173-74, Transcripts of Evidentiary Hearing; ECF No. 178, Order denying motions to suppress).

Considering Reed's two pending cases, over the past two years the government and Reed engaged in extensive plea discussions to formulate a global resolution to both cases. Those negotiations culminated with the Rule 11 Plea Agreement Reed signed and pled guilty to on November 2, 2021 (ECF No. 191, Plea Agreement, PageID.816), as well as a corresponding proposed Rule 11 Plea Agreement offered in the Hobbs Act case. As part of this global resolution, the

parties agreed that the sentence of imprisonment in this case "may not exceed the bottom of the defendant's guideline range as determined by the Court," and also agreed that Reed's "total sentence of imprisonment for this case and any sentence imposed by the Court in Case No. 19-20492 shall not exceed the bottom of the defendant's guideline range in this case as determined by the Court." (*Id*. at PageID.825). The parties also agreed that 10 year (120 month) minimum applied.

At the end of the plea hearing, Reed moved to have standby counsel be appointed counsel and the Court granted the motion. (ECF No. 193, Order).

## III.    Advisory Sentencing Guideline Range

As mentioned above, the parties did not agree on all applicable sentencing guidelines or an applicable guideline range. The government recommends that the Court find that Reed's guideline range is **292-365 months**, as follows.

Base Offense Level: The parties agreed that, based on the drug quantity, Reed's base offense level was 38, and the Probation Department concurred. (ECF No. 191, Plea Agreement, PageID.823; PSR ¶ 29). The parties did not object.

Enhancement: The parties did not agree on whether the 2-level enhancement for possessing a dangerous weapon under USSG § 2D.1(b)(1) applied or not. The government recommended that the Court apply it; Reed disagreed. (ECF No. 191, Plea Agreement, PageID.823). The Probation Department sided with the government (PSR ¶ 30). Reed objected.

The Court should apply the 2-level enhancement, which applies in drug cases "[i]f a dangerous weapon (including a firearm) was possessed." USSG § 2D1.1(b)(1). The guidelines further state that the "enhancement for weapon possession in subsection (b)(1) reflects the increased danger of violence when drug traffickers possess weapons. The enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." Application Note 11, USSG 2D1.1.

The government has the burden of showing "by a preponderance of the evidence that '(1) the defendant actually or constructively 'possessed' the weapon, and (2) such possession was during the commission of the offense.'" *United States v. Catalan*, 499 F.3d 604, 606 (6th Cir.2007) *quoting United States v. Hill*, 79 F.3d 1477, 1485 (6th Cir.1996). Although the government's burden contains "two separate inquiries, in most instances they collapse into a single factual determination because the weapon was present when the arrest took place or where the crime was committed." *United States v. Sanchez*, 928 F.2d 1450, 1460 (6th Cir.1991), *abrogated on other grounds by United States v. Jackson–Randolph*, 282 F.3d 369 (6th Cir.2002). In such "instances, once the government proves a defendant was in possession of a weapon, its burden is satisfied."

Once established, the burden then "shifts to the defendant to show that it was 'clearly improbable' that the weapon was connected to the offense." *Catalan*, 499 F.3d at 606. A defendant must present evidence, not mere argument, to meet his or

her burden. *United States v. Greeno*, 679 F.3d 510, 515 (6th Cir. 2012); *see also United States v. Hough*, 276 F.3d 884, 894 (6th Cir. 2002) ("[S]peculation is not evidence and does not establish that it was 'clearly improbable' that [the defendant] possessed the firearms during the offense."). Courts consider the following factors, none of which is controlling, when determining whether the application of a Section 2D1.1(b)(1) enhancement was appropriate:

> (1) the type of firearm involved; (2) the accessibility of the weapon to the defendant; (3) the presence of ammunition; (4) the proximity of the weapon to illicit drugs, proceeds, or paraphernalia; (5) the defendant's evidence concerning the use of the weapon; and (6) whether the defendant was actually engaged in drug-trafficking, rather than mere manufacturing or possession.

> *Greeno*, 679 F.3d at 515.

During the traffic stop on November 30, law enforcement found the loaded Glock 27 pistol in the center console of the vehicle, right next to Darell Reed, who was driving. As depicted in the photographs above, the parcel of methamphetamine that law enforcement had delivered to Reed's Utica Road address in Roseville, and which Reed had personally retrieved from the residence, was found on the passenger floorboard, adjacent to the gun. Plainly, Reed brought his loaded Glock to protect himself and his drugs when he went to retrieve them.

These facts alone support application of the enhancement: the weapon was a loaded handgun that was readily accessible to and possessed by Reed and next to the parcel of more than a kilogram of crystal meth that he was trafficking.

But there is more evidence that Reed knowingly possessed the Glock 27 while transporting drugs. Law enforcement found Reed's cell phone in the vehicle. In Reed's text messages, law enforcement learned that just 10 days earlier, on November 20, 2017, Reed sent the following text messages to a friend admitting that he owned and carried with him a Glock 27, the exact pistol found in the vehicle.



Reed explicitly states that he carries a "glock 27 on me," and he "love[s] that mf." And he brought it with him to pick up his next parcel of crystal meth that day.

Reed disagrees, arguing that the Court should not apply the enhancement because "any such weapon was not connected with the subject offense." (ECF No. 208, PSR Objections, PageID.998). But Reed does not present any evidence supporting his argument as is required to rebut the government's evidence and he does not show that his possession of the gun was "clearly improbable." *Greeno*, 679 F.3d at 515. And the evidence reveals that the Glock 27 was plainly Reed's gun, he brought the gun with him when he went to retrieve the methamphetamine parcel, and the Court should apply the 2-level enhancement.

Acceptance of Responsibility: In the plea agreement, the government agreed to recommend that Reed receive a 2-level reduction to his offense level for acceptance of responsibility under USSG § 3E1.1(a) and an additional one-level reduction under § 3E1.1(b). (ECF No. 191, Plea Agreement, PageID.822-823).

The agreement further provided, however, that "the government will be released from its obligations under this paragraph, will be free to argue that the defendant not receive *any* reduction for acceptance of responsibility under § 3E1.1, and will be free to argue that [Reed] receive an enhancement for obstruction of justice under § 3C1.1," in the following circumstances:

1) The government learns that Reed engaged in any conduct inconsistent with acceptance of responsibility—including, but not limited to, making any false statement to, or withholding information from, his probation officer;

2) Obstructing justice in any way;

3) Denying his guilt on the offense to which he is pleading guilty;

4) Committing additional crimes after pleading guilty; or

5) Otherwise demonstrating a lack of acceptance of responsibility as defined in USSG § 3E1.1.

Here, Reed has "engaged in conduct inconsistent with acceptance of responsibility" and "otherwise demonstrat[ed] a lack of acceptance of responsibility as defined in USSG § 3E1.1." The government bases its argument on the terms of the Rule 11 Plea Agreement and the guidelines provisions in § 3E1.1. With respect to the Guidelines, the Application Notes include a non-exhaustive set of circumstances and factors that can be considered in deciding whether to reduce a

defendant's offense level based on acceptance of responsibility. USSG § 3E1.1, Application Note 1. Notably, there is no bright-line rule. While a defendant who proceeds to trial typically does not qualify for acceptance points, there are "rare circumstances" where such a defendant might still qualify. USSG § 3E1.1, Application Note 2. On the contrary, while typically a defendant like Reed who enters a timely plea will qualify for points for acceptance of responsibility, the fact of the plea "may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility. A defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right." USSG § 3E1.1, Application Note 3. Given the nature of the necessary inquiry, "[t]he sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility. For this reason, the determination of the sentencing judge is entitled to great deference on review." *Id*. at Application Note 5.

Reed did not completely accept of responsibility under the plea agreement and guidelines. First, after pleading guilty, he filed a motion to withdraw his plea, arguing, among other things, that he had been "confused as to the contents of the plea," and that he wanted to withdraw from his guilty plea agreement. (ECF No. 194, Motion, PageID.837). Reed's arguments were belied by the transcript from the plea hearing, which contradicted his claim that he was "confused." (ECF No. 200, Plea Tr., PageID.856-64). The government responded to Reed's motion, the Court held a hearing, and at the hearing Reed withdrew his motion.

Second, Reed's failure to resolve his 2019 is inconsistent with acceptance of responsibility. As mentioned, the Rule 11 Plea Agreement that Reed signed and pursuant to which he pleaded guilty contained important provisions confirming that it was part of a negotiated "global resolution" of both of Reed's federal cases. As part of this global resolution, the parties agreed that the sentence of imprisonment in this case "may not exceed the bottom of the defendant's guideline range as determined by the Court," and also agreed that Reed's "total sentence of imprisonment for this case and any sentence imposed by the Court in Case No. 19-20492 shall not exceed the bottom of the defendant's guideline range in this case as determined by the Court." (ECF No. 191, Plea Agreement, PageID.816). At the plea hearing, the Court reviewed those provisions with Reed, he confirmed that he understood them, and the government reinforced the parties' agreement, confirming on the record that the plea agreement was "part of a negotiated global resolution in both cases." (ECF No. 200, Plea Tr., PageID.877).

At the time, Reed had been given a Rule 11 Plea Agreement in the 2019 case, however, he had not yet pleaded guilty in that case. His plea hearing in the 2019 was set for February 1, 2022, and then delayed to March 9, 2022. (ECF No. 335 & 350, Notices to Appear). At that hearing, Reed advised the Court that he would not be pleading guilty under the proposed Rule 11 Plea Agreement in the 2019 case.

Based on the terms of the Rule 11 Plea Agreement in this case and the record before the Court, Reed has engaged in "conduct inconsistent with acceptance of

responsibility" by filing his motion to withdraw his guilty plea and not pleading guilty in the 2019 case. To be clear, Reed was not required to plead guilty in the 2019 case, but his failure to do so means he does not qualify for the maximum amount of acceptance of responsibility.

Here, the government would be within its right to argue that the Court not apply any reduction for acceptance of responsibility. Even so, the government recommends that the Court apply a 2-level reduction for acceptance of responsibility, and not apply the third level.

Criminal History: The Probation Department calculated a criminal history score of four and a Criminal History Category of III. (PSR ¶ 42). The government agrees and the parties did not object.

Guidelines: With a base offense level of 38, a 2-level increase for the firearm, a 2-level decrease for acceptance of responsibility, and Criminal History Category of III, the government requests that the Court find that Reed's applicable guideline range is **292-365 months**.

## IV.   Other Relevant § 3553(a) Factors

Congress has provided, through 18 U.S.C. § 3553(a), the relevant objectives and factors to be considered by sentencing courts in imposing a "sentence sufficient, but not greater than necessary." Those objectives are: (1) the nature and circumstances of the offense, and the history and characteristics of the defendant; (2) the need for a sentence to reflect the basic aims of sentencing (including

retribution, deterrence, incapacitation, and rehabilitation); (3) the kinds of sentences legally available; (4) the Sentencing Guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need for restitution.

The government believes that the Section 3553(a) factors support a sentence of imprisonment of **292 months**, followed by a five-year term of supervised release.

To begin with, Darell Reed committed a very serious offense. Over several months in 2017, he acquired and sold dangerous, highly-addictive crystal methamphetamine. He arranged for the parcels of crystal meth to be shipped from California to Southeast Michigan, sending thousands of dollars to individuals in Southern California via money transfer service. He even flew to California to arrange for the shipment of the drugs to Michigan. He paid about $2,000 per pound of crystal meth and sold the drugs for about $10,000 per pound – meaning Reed made tens of thousands of dollars trafficking meth.

And he (and others) did so as part of a conspiracy involving more than 4.5 kilograms of "Ice," an amount that triggers the highest possible base offense level for drug trafficking. He exploited people's addiction to meth to make money. And he distributed the drugs not just in Michigan, but he also served as a source of supply for drug dealers in other states, including West Virginia.

In addition, Reed engaged in this conduct while armed with a loaded Glock 27, which he brought with him on November 30, 2017, when he went to retrieve a parcel of crystal meth from the Roseville address. Reed did not engage in violent conduct with the Glock 27 in this case, however, as the guidelines make clear, the combination of drug trafficking and loaded firearms is extraordinarily dangerous and commonly leads to violence, a real possibility that Reed risked here.

Reed is only 31 years old, but he has already accrued a significant criminal history – and his criminal conduct did not stop after he was arrested in this case. His criminal history began in 2008, when he was 17 years old and pled guilty to second degree retail fraud. (PSR ¶ 39). He was sentenced to probation but violated that probationary sentence. (*Id*.).]

Next, in January 2010, he was arrested when he provided police with someone else's driver's license after being pulled over for a traffic stop and Reed did not have a license. (PSR ¶ 40).

Then, in May 2010, Reed was arrested, charged, and later convicted for his role in a jewelry store robbery in Pennsylvania, an incident that led to Reed fleeing the scene in a vehicle, smashing into another vehicle, and almost hitting a person with the vehicle, before being stopped. (PSR ¶ 41). He was convicted of aggravated assault, robbery conspiracy, and fleeing law enforcement, and sentenced to 2-4 years in prison. He was paroled in 2014.

Just a few years later, he engaged in the conduct here. Notably, Reed reports never having had a job. (PSR ¶ 82). And that did not change after being arrested and released on bond in this case. Instead, and incredibly, Reed reverted to robbing jewelry stores. Reed did not go into the stores. Rather, he was the leader of an extensive organization that committed smash and grab Hobbs Act robberies at jewelry stores in Indiana, Ohio, Illinois, Pennsylvania, South Carolina, Louisiana, and other states. Reed was charged with Hobbs Act conspiracy in the 2019 case and the Court revoked his bond. The Court is very familiar with Reed's charges in the 2019 case, and the fact that he engaged in that conduct while on bond in this case supports a significant sentence here.

There are factors weighing in Reed's favor. To his credit, he has supportive family and had a good relationship with his mother, who sadly died in April 2020 of Covid-19. (PSR ¶¶ 54-59.) He has no significant physical or mental health conditions, though he appears to have a gambling problem to address. (PSR ¶¶ 67-71.) He also appears to have a substance abuse problem. (PSR ¶¶ 73-77.) While he did not graduate from high school, he reports having earned his GED while incarcerated and taken community college classes. (PSR ¶ 78-79).

Ultimately, however, a prison sentence is warranted in this case to punish him for his actions, hopefully deter him (and others) from future criminal activity, and protect the public.

Here, the government believes that a sentence **of 292 months**, the bottom of the government's recommended applicable guideline range, followed by a five-year term of supervised release would be "sufficient, but not greater than necessary" to achieve the ends of § 3553(a).

## V.    Conclusion

For the reasons stated above, the United States recommends a sentence **of 292 months** and a five-year term of supervised release.

Respectfully submitted,

DAWN N. ISON
United States Attorney

*s/Andrew J. Lievense*
Andrew J. Lievense
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
andrew.lievense@usdoj.gov
Dated: March 30, 2022                              (313) 226-9665

## CERTIFICATE OF SERVICE

I hereby certify that on March 30, 2022, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

John McManus

I further certify that I have mailed by United States Postal Service the document to the following non-ECF participants:

None.

*s/Andrew J. Lievense*
Andrew J. Lievense
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
andrew.lievense@usdoj.gov
(313) 226-9665